**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

DELILA ELLIOT,
On Behalf of J.H. (Minor Child),

                    Plaintiff,

vs.                                                    Case No.  3:09-cv-985-J-JRK

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                    Defendant.

_____/

**<u>OPINION AND ORDER</u>**[1]

**I.  Status**

        Delila Elliot, on behalf of her minor child, J.H.,[2] is appealing the Commissioner of the

Social Security Administration's final decision denying a claim for benefits under the Social

Security Act.  Three applications for supplemental security income have been filed by

Plaintiff on Claimant's behalf, the third of which is at issue in this appeal.  The first application

was filed on June 18, 2001 and denied on December 7, 2001.  Transcript of Administrative

Proceedings (Doc. No. 13; "Tr.") at 59-62, 39, 50-52.  The second application was filed on

August 13, 2002, Tr. at 64-67, was denied initially on March 7, 2003, Tr. at 53-54, 44, and

was denied upon reconsideration on May 13, 2003. Tr. at 56-58, 40.  The third application

_____

        [1]        The parties consented to the exercise of jurisdiction by a United States Magistrate
Judge, see Consent to the Exercise of Jurisdiction by a United States Magistrate Judge (Doc. No. 15),
and the Order of Reference was entered on March 11, 2010 (Doc. No. 18).

        [2]        For purposes of this Opinion and Order, the designation "Claimant" refers to the minor
child, J.H., and the designation "Plaintiff" refers to the mother, Delila Elliot.

was filed in October or November 2004, Tr. at 69-70, 47, was denied initially on February 25, 2005, Tr. at 47, and was denied upon reconsideration on May 20, 2005.  Tr. at 46.  On July 11, 2005, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  Tr. at 37.  After holding a hearing on April 4, 2007, Tr. at 481-506, the ALJ issued a Decision on August 11, 2007 finding Claimant not disabled from October 20, 2004 through the date of the Decision.  Tr. at 17, 28.  On August 11, 2009, the Appeals Council denied Plaintiff's request for review, making the ALJ's written Decision the final decision of the Commissioner.  Tr. at 6.  On September 29, 2009, this action was commenced under 42 U.S.C. § 1383(c)(3), by the timely filing of the Complaint (Doc. No. 1) seeking review of the Commissioner's final decision.  The available administrative remedies have been exhausted, and the case is properly before the Court.

Three issues are raised on appeal: (1) whether the ALJ properly determined that Claimant's limitations do not meet Listing 112.05 (defining the impairment for mental retardation) of the Listings of Impairments ("the Listings"), found at 20 C.F.R. § 404 app.; (2) whether the ALJ properly determined that Claimant's limitations do not functionally equal the Listings; and (3) whether the ALJ fully developed the record in light of the ALJ's election not to order an up-to-date psychological examination and not to call upon an expert to testify.  Memorandum in Opposition to the Commissioner's Decision (Doc. No. 20; "Pl.'s Mem.") at 10-13.  For the reasons explained herein, the undersigned concludes the ALJ properly found that Claimant does not meet the Listing at issue or functionally equal the Listings, and the ALJ adequately developed the record.  Therefore, the Commissioner's final decision is due to be affirmed.

## II.  Background

Claimant, who was born in 1992, Tr. at 138, 488, was fifteen years old when he had his hearing before the ALJ.  Tr. at 488.  At the time of the hearing, Claimant had been residing at Hastings Youth Academy, a Florida Department of Juvenile Justice facility, for four months because of a probation violation in connection with a burglary charge.  Tr. at 487-90.  Before residing at Hastings Youth Academy, he had most recently attended Jacksonville Marine Institute-East and Greenville Hills Academy, juvenile developmental institutions.  Tr. at 490, 493, 243.  Since grade school, Claimant has struggled with academics and has required special education services as summarized in more detail below. The claim of disability is based on an alleged learning disorder, depression, and behavior problems, as well as "possible bipolar " disorder.  Tr. at 99, 142.

### A.  Academic History

In 1997, Plaintiff enrolled Claimant in Kindergarten at Hyde Grove Elementary School. Tr. at 283, 290.  At the end of the academic year 1997-1998, Claimant received marks of "U" (unsatisfactory) in reading and "S-" (some variation of satisfactory[3]) in mathematics.  Tr. at 283, 290.  Claimant was retained in Kindergarten.  Tr. at 283, 290.  The next academic year, 1998-1999, Claimant improved his reading mark to an "S" (satisfactory) and his mathematics mark to an "S+" (some variation of satisfactory).  Tr. at 283, 290.  Claimant was promoted to first grade.  Tr. at 283, 290.  In first grade, academic year 1999-2000, Claimant received marks of "S-" (some variation of satisfactory) in both reading and mathematics, and he was academically promoted to the next grade.  Tr. at 283, 290.   In second grade,

---

[3]        While "S" is defined as satisfactory in Claimant's academic records from elementary school, "S+" and "S-" are not defined.  See Tr. at 284.

academic year 2000-2001, Claimant received marks of "F" (below 70) in reading, spelling, and mathematics, a mark of "D+" (70-76) in language, a mark of "C-" (77-84) in "citizen," marks of "S" (satisfactory) in social studies, science, physical education, music, and art, and a mark of "N" (needs improvement) in writing.  Tr. at 290, 292.  Based on those grades, Claimant was retained in second grade.  Tr. at 290, 292.  However, Claimant enrolled in summer school for reading and mathematics, and he received marks of "P" (passing) in each subject.  Tr. at 283.  After summer school, Claimant was promoted to third grade.  Tr. at 283.  In third grade, academic year 2001-2002, Claimant continued to struggle.  He received marks of "F" (below 60[4]) in reading and spelling, a mark of "D" (60-69) in language, a mark of "D+" (60-69) in mathematics, a mark of "C-" (70-79) in science, marks of "C" (70-79) in social studies and "citizen," and marks of "S" (satisfactory) in social studies, music, art, and writing.  Tr. at 284.  At the end of the school year, Claimant was retained in the third grade.  Tr. at 284.

In third grade, academic year 2002-2003, Claimant was placed in the "S.T.A.R." program, a program designed "to try to boost [struggling students] to the level of their peers." Tr. at 276.  Despite being "easily distracted and often off task," Claimant received all "A"s (90%-100%) and "B"s (80%-89%) in the academic subjects in third grade.  Tr. at 272 (capitalization omitted).  Claimant's teacher reported he "[o]ften ha[d] an 'I don't care' attitude."  Tr. at 265; see also Tr. at 267.

In fourth grade, academic year 2003-2004, Claimant remained in the "S.T.A.R." program.  Tr. at 315.  Claimant received marks of "B" in spelling, "C+" in citizenship, "C" in

---

[4]    After the 2000-2001 academic year, the numerical standards for each letter grade changed.  Tr. at 284.

social studies and science/health, "D" in reading, language, and mathematics, and "S-" in writing.  Tr. at 316.  On March 23, 2004, Claimant was referred to the School Psychology Services Unit for a psychological evaluation by the Child Study Team at Hyde Grove Elementary School "due to behavioral and academic difficulties."  Tr. at 315.  Claimant's teacher reported that his "behavior [was] interfering with his academic growth.  He play[ed] and talk[ed] during lessons. [He] [was] always being sarcastic and making jokes. [He] [was] constantly off task and not following directions."  Tr. at 315.[5]

For the 2004-2005 and 2005-2006 school years, Plaintiff apparently enrolled Claimant in an Exceptional Student Education program at Jefferson Davis Middle School. Tr. at 323, 144.  Claimant earned mostly "Ds" and "Fs" in the program.  Tr. at 263, 323.  After Claimant was charged with "Burglary of a Structure without person inside" in March 2006, Claimant was committed to Greenville Hills Academy by the Honorable Adrian G. Soud, Circuit Judge, Fourth Judicial Circuit, State of Florida.  Tr. at 243.

Claimant was admitted to Greenville Hills Academy on March 30, 2006 with a projected discharge date of July 30, 2006.  Tr. at 243; see also Tr. at 253 (Notice of Change of Educational Placement).  At the time of his admission, Claimant's diagnosis was "Conduct Disorder, childhood onset Attention Deficit Hyperactivity Disorder by History."  Tr. at 243. A Greenville Hills Academy evaluator described Claimant as a "talented young man when he applies himself" and as capable of "be[ing] a very polite young man when he chooses to be."  Tr. at 244.  However, the evaluator also noted Claimant's lack of "empathy for what he has done" and a persistent "'I do not care attitude.'"  Tr. at 244.  An Individual Education

_____

[5] The findings of the school psychologist are summarized in detail in the "Medical History" section infra at Part II.B.5.

Plan/Transition Plan formulated for Claimant in April 2006 indicates he was "Emotionally Handicapped," and he had deficiencies in reading, writing, and mathematics.  Tr. at 260, 262.  Claimant's "disability" had only a "[m]ild [e]ffect" on his "progress and participation," meaning he was "working below grade level in some areas and may be able to participate and achieve standards/make progress in the general curriculum."  Tr. at 262.[6]

After Claimant's release from Greenville Hills Academy, he attended Jacksonville Marine Institute-East for a short duration of time in 2006.  Tr. at 330.  In early 2007, Claimant, then in ninth grade, was committed to Hastings Youth Academy in St. Johns County.  Tr. at 164-71, 335, 339.  An Individual Education Plan prepared by the St. Johns County School District described Claimant as functioning more than two grade levels behind in math, reading, writing, and language skills. Tr. at 165-67.  Instructors noted Claimant was able to maintain classroom behavior when he chose to do so, but he had difficulty staying on task.  Tr. at 164, 168.  Additionally, it was noted that "[d]ue to his disability he comprehends and understands information at a slower rate and his retention rate is low."  Tr. at 165.

On October 31, 2008, Claimant was adjudicated for carrying a concealed firearm.  Tr. at 360, 374, 388, 409, 429, 435, 479.  Claimant was committed to DeSoto Dual Diagnosed Correctional Facility by the Honorable Jack Schemer, Circuit Judge, Fourth Judicial Circuit, State of Florida.[7]  Tr. at 479.  Claimant was admitted to the facility on

---

[6]     The Individual Education Plan/Transition Plan from Greenville Hills Academy is of poor quality.  See Tr. at 260-62.  This is the most information the undersigned can glean from the Plan.

[7]     Records from this facility were received by the Appeals Council after the ALJ issued a written Decision.  Tr. at 5.

November 13, 2008; while in custody, Claimant participated in specialized courses at Carlstrom Center.  Tr. at 476, 348-49, 350-480.  An Individual Education Plan prepared on November 25, 2008 indicates Claimant was "working below grade in all subject areas."  Tr. at 470.  As a result of his disability, Claimant "need[ed] a structured learning environment and a modified curriculum."  Tr. at 470.  It was noted that Claimant demonstrated age appropriate daily living skills.  Tr. at 473.  Academic records from the third quarter of the 2008-2009 school year indicate Claimant received an 85% in English, an 80% in math, a 74% in science, a 45% in world history, a 90% in intensive reading, and an 86% in business systems and technology.  Tr. at 348.  Two teachers commented that Claimant was working below his grade level; two teachers commented he was making good effort; and one teacher commented his work had improved.  Tr. at 348.  Records from the fourth quarter of the 2008-2009 school year indicate Claimant received a 78% in English, an 80% in math, a 72% in science, a 100% in world history, a 90% in intensive reading, and an 83% in business systems and technology.  Tr. at 349.  All teachers commented that Claimant was making good effort or that his work had improved.  Tr. at 349.  During his time in custody, Claimant's supervisors noted progress in Claimant's life skills, noted that he was often friendly and cooperative, and noted that he often could stay focused.  Tr. at 375-76, 431.  In Spring 2009, Claimant took the Florida Comprehensive Assessment Test for tenth grade.  Tr. at 344.  Claimant failed both the reading and the mathematics tests.  Tr. at 345, 346.

**B. Medical History**[8]

### 1. Diagnostic Evaluation and Intellectual Testing by Dr. Knox

On October 9, 2001, Claimant was evaluated by Peter Knox, M.Ed., Psy.D., DABPS at the request of the Division of Disability Determinations. Tr. at 189-96. At the time, Claimant was nine years old. Tr. at 189. Plaintiff reported that Claimant was exhibiting signs similar to those of her daughter, who received disability benefits. Tr. at 189. Plaintiff indicated Claimant was not doing well in school and had recently been tested for possible hearing problems, but the testing revealed his hearing was fine. Tr. at 189; see also Tr. at 197-98 (audiometric results). As far as family history, Plaintiff reported that Claimant's father was in and out of jail, so he was not involved in Claimant's life. Tr. at 189-90.

Claimant was tested using the Wechsler Intelligence Scale for Children-Third Edition and the Wechsler Individual Achievement Test. Tr. at 191. Claimant demonstrated a verbal IQ of 79, a performance IQ of 68, and a full scale IQ of 71. Tr. at 191. Dr. Knox noted Claimant "may experience difficulty in keeping up with his peers in a wide variety of situations that require age-appropriate thinking and reasoning abilities." Tr. at 191. Dr. Knox indicated Claimant's "general cognitive ability is within the Borderline range of intellectual functioning, as measured by the Wechsler Intelligence Scale for Children - - Third Edition." Tr. at 191; see also Tr. at 193. Claimant "performed in the Well Below Average range" in reading, mathematics, language, and writing. Tr. at 192. Particular areas of difficulty identified by Dr. Knox included reading comprehension and mathematics reasoning.

---

[8] There are numerous "well child" check up records and other medical records from early in Claimant's life (ages one through five), one X-ray record from 2001, and a summary of laboratory results from 2005 that do not provide any insight into Claimant's alleged disabling conditions. See Tr. at 179-88, 175-76, 223. Therefore, they are not discussed.

Tr. at 193.  Despite these test indications, Dr. Knox noted Claimant "appear[ed] to ha[ve] no great deficit when it comes to learning."  Tr. at 195.  Additionally, no problems were noted in the areas of self-care activities, motor skills, communication, social functioning, or completing tasks/concentration and persistence.  Tr. at 195.  Dr. Knox diagnosed Claimant with an "Adjustment Disorder with mixed emotions and conduct" and "Borderline IQ[.]"  Tr. at 196.  He assigned a Global Assessment of Functioning ("GAF") score of sixty.  Tr. at 196.

### 2.  Opinion of Dr. Bloomfield

On October 19, 2001, Serena L. Bloomfield, Ed.D., a nonexamining psychologist, filled out a Child Disability Evaluation Form.  Tr. at 201-06.  Dr. Bloomfield opined Claimant has borderline intellectual functioning and an adjustment disorder.  Tr. at 201.  According to Dr. Bloomfield, although Claimant has severe impairments, they do not meet or medically equal the Listings.  Tr. at 201.  As far as domain limitations, Dr. Bloomfield indicated there are no limitations in moving about and manipulating objects, there are no limitations in health and physical well-being, there are marked limitations in acquiring and using information, there are less than marked limitations in attending and completing tasks, and there are less than marked limitations in interacting and relating with others.  Tr. at 204-05.  Dr. Bloomfield apparently inadvertently failed to assign a limitation (or lack thereof) for caring for oneself, but she indicated in the comments section that Claimant "cleans self, dresses, feeds self[.]"  Tr. at 204.  According to Dr. Bloomfield, Claimant "does not appear to be retarded . . . ."  Tr. at 206.

On February 1, 2003, Dr. Bloomfield filled out a second Child Disability Evaluation Form, in which her opinions changed only slightly.  Tr. at 211-16.  Dr. Bloomfield noted the

same impairments and opined they do not meet or functionally equal the Listings.  Tr. at 211.  Dr. Bloomfield assigned no limitation in the domains of moving about and manipulating objects, caring for oneself, and health and physical well-being.  Tr. at 214.  She assigned less than marked limitation in the areas of acquiring and using information, attending and completing tasks, and interacting and relating with others.  Tr. at 215.  She noted that he "appear[ed] to have worsened since 6-01," but that he was "now on Adderall with some improvement."  Tr. at 216.  She also noted Claimant was "doing well now academically."  Tr. at 216.

### 3. Psychiatric Evaluation by Dr. Curtis

On September 24, 2002, Claimant was evaluated by Stephen L. Curtis, M.D., with the chief complaint being that he kept getting into trouble.  Tr. at 207-09.  Dr. Curtis noted Claimant had been placed in the S.T.A.R. program at school.  Tr. at 207.  He also noted a couple specific instances of behavior problems involving grabbing a kitchen knife and breaking his brother's toy.  Tr. at 207.  Dr. Curtis diagnosed impulse control disorder NOS and probable ADHD.  Tr. at 209.  He assigned a GAF score of forty.  Tr. at 209.  Dr. Curtis prescribed Adderall.  Tr. at 209.

### 4. Opinion of Dr. Boger

On April 28, 2003, Patricia A. Boger, Ph.D., a nonexamining psychologist, filled out a Childhood Disability Evaluation Form.  Tr. at 217-22.  Dr. Boger opined Claimant has impulse control disorder, probable ADHD, and borderline intellectual functioning.  Tr. at 217.  Though severe, Dr. Boger opined the impairments do not meet or medically equal the Listings.  Tr. at 217.  According to Dr. Boger, Claimant has no limitation in the domains of

moving about and manipulating objects, caring for oneself, and health and physical well-being.  Tr. at 220.  Dr. Boger assessed a marked limitation in acquiring and using information, and less than marked limitations in attending and completing tasks and interacting and relating with others.  Tr. at 221.

### 5.  Duval County School Board Psychological Evaluation

On June 9, 2004, Claimant, having been referred by the Child Study Team at Hyde Grove Elementary School for a psychological evaluation, underwent a psychological evaluation administered by Amy L. Winters, M.A., C.A.S. of the Duval County School Board. Tr. at 315-21.  Ms. Winters administered several tests, and Claimant was cooperative throughout the evaluation.  Tr. at 316, 317-18.  On the Wechsler Intelligence Scale for Children-Third Edition, Claimant "obtained a Full Scale IQ of 70, which places his ability within the Borderline range of intellectual functioning, and is ranked in the 2nd percentile." Tr. at 317.  It was noted that "[a] student at this level of intellectual functioning may learn at a slower rate, retain less knowledge, and require more time to complete tasks than other students of his same age."  Tr. at 317.  Ms. Winters opined that "[b]ased on the results of th[e psychological] evaluation, it appears that [Claimant's] emotional difficulties are the primary handicapping conditions affecting his academic performance in the regular classroom at this time."  Tr. at 318. Furthermore, Ms. Winters noted that Claimant's learning ability reflected no processing deficits. Tr. at 318. Claimant's only significant deficit was in his social-emotional functioning.  Tr. at 318.  Ms. Winters "recommended that the Child Study Team review these evaluation results in conjunction with teacher observations in order to determine [Claimant's] eligibility for specialized school services."  Tr. at 318.

Following the evaluation, Dr. Winters "requested a social history and Burks' Behavior Rating Scales" to be completed by the Duval County School Social Work Services Department.  Tr. at 309.  Social worker June Latney authored the Social History report.  Tr. at 309.  According to Plaintiff, Claimant "seem[ed] to have to be busy at all times and if he [was] not kept busy doing something constructive, he ha[d] a tendency to get into trouble." Tr. at 311.  Claimant completed chores "with reminders and without supervision." Tr. at 311. Plaintiff and Claimant had recently moved into a new neighborhood, and Claimant was "in the process of developing friendships[.]" Tr. at 311.  "[A]lthough [Claimant] appear[ed] to possess the ability to complete assigned class work, he complete[d] work only when he [was] motivated to do so."  Tr. at 311.  The results of the Burks' Behavior Rating Scales indicated Claimant "display[ed] four out of five characteristics of the Distractible child and seven of nine characteristics of the Aggressive Child."  Tr. at 313.

### 6. Children's Home Society/Dr. Romero

On November 14, 2005, Claimant was admitted to the Children's Home Society, Buckner Division, Mental Health Services Unit, with an estimated length of stay of one year. Tr. at 303, 305.  On December 12, 2005, Claimant presented to Renato J. Romero, M.D. at the Children's Home Society for a psychological evaluation.  Tr. at 303.  Plaintiff was having a hard time controlling Claimant's behavior.  Tr. at 303.  Dr. Romero noted that Claimant had recently been expelled from Jefferson Davis Middle School.  Tr. at 303.  During the evaluation, Dr. Romero did not observe any symptoms of ADHD; to the contrary, Claimant was cooperative and "sat quietly in the chair with minimal fidgeting." Tr. at 304.  Additionally, Dr. Romero's evaluation indicated Claimant's memory, concentration, and attention span

were average.  Tr. at 304.  "[Claimant] [was] estimated to be in the average or below average range of intelligence with some learning difficulties."  Tr. at 304.  Dr. Romero diagnosed "Dysthymic Disorder" and "R/O . . . Bipolar Disorder NOS"[9] and assigned a GAF score of forty-eight.  Tr. at 304.  Plaintiff was issued a prescription for Prozac.  Tr. at 305.

During a follow-up appointment on January 30, 2006, Claimant was unable to speak because his jaw was wired shut.  Tr. at 297.  Claimant had gotten in an altercation with a young man in his neighborhood, and Claimant's jaw was broken as a result of the fight.  Tr. at 297; see also Tr. at 226-37 (medical records relating to broken jaw).  Under the circumstances, Dr. Romero was unable to conduct a mental examination. Tr. at 297.

Apparently because Claimant had been committed to Greenville Hills Academy, he was discharged from the Children's Home Society on April 3, 2006, with instructions to "continue with services after residential treatment[.]"  Tr. at 295.

### 7.  Greenville Hills Academy/Dr. Herkov

As summarized in the "Academic History" section supra at Part II.A., Claimant was committed to Greenville Hills Academy on March 30, 2006 in connection with the burglary charge. Tr. at 243. An assessment was needed because the Department of Juvenile Justice was concerned about anger management issues, thought disturbances, and suicide risk. Tr. at 242.  Claimant also reported a traumatic life experience.  Tr. at 241.  At the time of his admission to Greenville Hills Academy, the diagnosis was "Conduct Disorder, childhood onset Attention Deficit Hyperactivity Disorder by History[.]"  Tr. at 243.  An individualized treatment plan was developed for Claimant aimed at combating problems with or

---

[9]     The undersigned surmises that "R/O" is shorthand for "rule out" and "NOS" is shorthand for "not otherwise specified."

maintaining behavior/anger management, family, education/school, legal, community service, social skills/self-esteem, and health.  Tr. at 246-52.

While in custody at Greenville Hills Academy, in March 2006, Claimant was referred to Michael J. Herkov, Ph.D., ABPP, for a mental health evaluation. Tr. at 322-27.  During the evaluation, Plaintiff reported Claimant previously "had a shunt placed in his brain,"[10] which prompted Plaintiff to file for social security on Claimant's behalf.  Tr. at 323.  Although Claimant had been prescribed Paxil, Adderral, and Prozac by the psychiatrist at the Children's Home Society, Claimant refused to take the medications.  Tr. at 323.  Plaintiff reported Claimant "want[ed] to be the 'class clown' at school" and "often [got] in trouble for being disrespectful to his teachers and being disruptive in class."  Tr. at 324.  Plaintiff further reported Claimant was "obsessive about washing his hands and then applying lotion on them."  Tr. at 324.

Dr. Herkov noted Plaintiff "was cooperative during the interview, but his attention span appeared to be extremely short."  Tr. at 324.  Dr. Herkov supervised Mary Beth Murray, B.S., in performing numerous psychological tests on Claimant.  Tr. at 322.  Claimant achieved a full scale IQ score of 69, which placed him in the second percentile compared to his peers.  Tr. at 325.  He performed at a first grade level in reading, a third grade level in spelling, and a fourth grade level in arithmetic.  Tr. at 325.  Dr. Herkov opined that "[g]iven [Claimant's] IQ capacities (FS IQ=69), he is not expected to have the necessary intellect to succeed in a traditional academic environment."  Tr. at 325.  "It [was] also unlikely that he

---

[10]        This is the only reference in the record to a shunt having been placed in Claimant's head that the undersigned can find.

[would] be able to obtain a diploma or GED without significant assistance and tutoring." Tr. at 325.

Dr. Herkov noted there was "no evidence of any psychomotor acceleration or retardation." Tr. at 324. Dr. Herkov diagnosed Claimant with Conduct Disorder, Moderate, and Attention Deficit/Hyperactive Disorder (ADHD), predominately inattentive type, and he assigned Claimant a GAF score of sixty-five. Tr. at 326. With respect to the Conduct Disorder, Dr. Herkov indicated "[i]ndividuls with this disorder often exhibit rejection of societal values and behavioral dysfunction as evidenced by [Claimant's incidents of] burglary, larceny, and violation of societal rules." Tr. at 326. With respect to ADHD, Dr. Herkov indicated "[i]ndividuls with this disorder are often easily distracted by extraneous stimuli, often do not seem to listen when spoken to directly, often avoid[], dislike[], or [are] reluctant to engage in tasks that require sustained effort, and ha[ve] difficulty sustaining attention in tasks or activities." Tr. at 326.

### 8. Dr. Saha

On November 14, 2006, Debabrata Saha, M.D. of the Mental Health Resource Center conducted a psychological evaluation. Tr. at 328-29. At that time, Claimant was attending the Jacksonville Marine Institute. Tr. at 328. Dr. Saha noted Claimant's "history of showing violent behavior and fighting." Tr. at 328. Claimant was not taking any medication. Tr. at 328. According to Dr. Saha, Claimant was cooperative during the interview, he was not easily distracted, he did not fidget during the interview, and his cognitive functions were within normal limits. Tr. at 328-29. Dr. Saha diagnosed Claimant with Conduct Disorder, Early Onset Type, and assigned a GAF score of fifty-five. Tr. at 329. Claimant was

prescribed Remeron with instructions to follow up in four weeks.  Tr. at 329.  There is no documentation of a follow-up visit in the record.

### 9.  Hastings Youth Academy/Dr. Lall

When Claimant was committed to Hastings Youth Academy in 2007, he was treated by Ayesha Lall, M.D.  Tr. at 335, 337, 339-40.  On March 14, 2007, Dr. Lall diagnosed Claimant with ADHD and prescribed Strattera.  Tr. at 335.  On May 9, 2007, Dr. Lall switched the medication to Concerta.  Tr. at 337.  She stated Claimant had poor concentration and focus, and he was hyper, forgetful, inattentive, and distracted.  Tr. at 337. Dr. Lall noted that while Claimant was residing at Hastings Youth Academy, he "need[ed] academic services for probable mental retardation."  Tr. at 173.  On June 6, 2007, Dr. Lall prescribed Clonidine, noting diagnoses of ADHD and insomnia.  Tr. at 340.

### 10.  DeSoto Dual Diagnosed Correctional Facility/Dr. Bellino

Claimant was admitted to Desoto Dual Diagnosed Correctional Facility on November 13, 2008.  Tr. at 476.  In an Initial Performance Plan dated December 4, 2008, goals set for Claimant while staying at the facility included committing to a substance free lifestyle, Tr. at 467, developing responsible thinking and complying with rules and laws, Tr. at 459, demonstrating emotionally stable mood and behavior, Tr. at 461, completing a high school diploma or GED, Tr. at 462, and understanding and explaining the "Balanced Approach Towards Restorative Justice for his own criminal behaviors," Tr. at 464.  To achieve those goals, Claimant would participate in programs in which he would be expected to attend weekly individual therapy sessions, to have active involvement in corrective thinking groups,

to be fully engage in daily routine and treatment activities, and to make efforts to be truthful and open.  Tr. at 459.

A Treatment Plan/Review and Progress Summary from December 9, 2008 indicates R. Bellino, M.D., a facility psychiatrist, diagnosed Claimant with Conduct Disorder, Adjustment Disorder with Depression, and R/O ADHD.  Tr. at 448.  He was assigned a GAF score of fifty-five.  Tr. at 448.  On December 14, 2008, Claimant was prescribed Seroquel.  Tr. at 456.  By December 24, 2008, the diagnoses had changed to Insomnia, Borderline IQ, R/O ADHD, Anger Disorder, and Bereavement.  Tr. at 439.  The GAF score remained the same.  Tr. at 439.

On December 31, 2008, it was noted that Claimant's "overall adjustment to the program ha[d] improved slightly since admission.  He ha[d] not yet been able to earn a positive review."  Tr. at 437-38.  A summary dated January 28, 2009 states Claimant's "adjustment to the program improved during th[e] review period" prior to that date.  Tr. at 432.  Claimant was nevertheless assigned a negative review because of "too many minor rule violations such as talking when not allowed, being non-compliant in the classroom, and cheating on a test."  Tr. at 432.  Claimant was observed to be getting along well with his peers and the staff.  Tr. at 432.

On January 22, 2009, the diagnoses were Insomnia, Borderline IQ, Anger Disorder, and Bereavement.  Tr. at 419.  The GAF score remained the same.  Tr. at 419.  There is no indication from this record that Dr. Bellino suspected ADHD.  Tr. at 419.  On February 19, 2009, the diagnoses changed slightly to Insomnia, mild; Borderline IQ; Anger disorder, mild; and Bereavement.  Tr. at 410.  The GAF score remained the same.  Tr. at 410.  A summary

from February 25, 2009 indicates Claimant had "poor" adjustment to the program.  Tr. at 407.  On two occasions, Claimant tied a sheet around his own neck; on one occasion, he assaulted a fellow inmate by punching him in the back of the head.  Tr. at 407.  Claimant was disrespectful to staff and his behavior was inappropriate.  Tr. at 407.  He was failing social studies.  Tr. at 407.  A decision was made to extend Claimant's time at the facility "due to the lack of progress towards his treatment objectives and the disruption he has caused to the daily functioning of the unit."  Tr. at 407.  On March 16, 2009, Claimant was prescribed Adderall.  Tr. at 403.

By March 17, 2009, the diagnosis had changed to R/O ADHD, Insomnia in remission, Bereavement resolving, Anger Disorder in remission, and Conduct Disorder.  Tr. at 394.  The GAF score remained at fifty-five.  Tr. at 394.  On March 25, 2009, it was noted that Claimant's adjustment had "fluctuated" during the time since the last review, because he had earned both negative and positive reviews.  Tr. at 391.  "He [was] making great improvement . . . but he continue[d] to have a failing grade in Social Studies."  Tr. at 391.

On April 15, 2009, the diagnoses were Insomnia, Borderline IQ, R/O ADHD, Anger Disorder, and Bereavement.  Tr. at 379.  The GAF score remained the same.  Tr. at 379.  The April 22, 2009 performance summary again notes a fluctuating review period, with both positive and negative reviews.  Tr. at 377.  On May 12, 2009, the diagnoses and the GAF score remained the same.  Tr. at 365.

On May 20, 2009, a progress report notes Claimant's fluctuating review period, with both positive and negative reviews.  Tr. at 363.  Problems included "talking while in line, not counting off properly, possession of contraband [(an image of a woman torn out from a

correctional officer's magazine)], telling staff to 'shut the f*** up,' arguing with his roommate about who gets to sit at the desk to eat, playing during a fire drill and lying to staff." Tr. at 363, 361. Despite the problems, Claimant was "getting good grades in school and [was] making some progress towards his treatment objectives." Tr. at 363. Claimant's behavior had stabilized and he was also making progress in effectively asserting himself. Tr. at 362. The last progress summary in the record is dated June 10, 2009 and includes the same diagnoses and GAF score as the previous two summaries. Tr. at 351.

### C. Hearing before the ALJ

The hearing before the ALJ was held on April 4, 2007. Tr. at 481. Plaintiff chose not to testify. Tr. at 485. Claimant testified about his living situation at Hastings Youth Academy and about his academic and legal history. Tr. at 486-93. He also testified to some extent about his mental health treatment, although he was not very knowledgeable about it. Tr. at 493-504. Following Claimant's testimony, his attorney (who also represents him in this Court) requested that the ALJ order a "current psychological eval[uation]" so the record "would be more complete[.]" Tr. at 504-05. The ALJ responded, "I'll consider it. I don't know what I'll do at this point." Tr. at 505.

### III.  The Disability Evaluation Process for Children and the ALJ's Decision

### A. Disability Evaluation Process for Children

An individual "under the age of 18 [is] consider[ed] . . . disabled if [the individual] ha[s] a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12

months."  20 C.F.R. § 416.906; 42 U.S.C. § 1382c(a)(3)(C)(i).  When determining whether an individual under the age of eighteen is disabled, an ALJ must follow the three-step sequential inquiry set forth in the Code of Federal Regulations ("Regulations"), determining as appropriate whether (1) the claimant is engaging in substantial gainful activity; (2) the claimant has a severe impairment or combination of impairments; and (3) the impairment(s) meet, medically equal, or functionally equal the Listings.  20 C.F.R. § 416.924; see also Shinn ex rel. Shinn v. Comm'r of Soc. Sec., 391 F.3d 1276, 1278-79 (11th Cir. 2004) (explaining the three-step sequential evaluation process for children); Turberville ex rel. Rowell v. Astrue, 316 F. App'x 891, 892 (11th Cir. Feb. 18, 2009) (unpublished) (same).

With respect to the analysis conducted at step three, which is at issue in this appeal, an ALJ considers the combined effect of all medically determined impairments, even those that are not severe.  20 C.F.R. §§ 416.923, 416.924a(b)(4), and 416.926a(a) and (c).  The ALJ then looks to "objective criteria set forth in [the Regulations]" to determine whether the impairment(s) cause severe and marked limitations.  Shinn, 391 F.3d at 1278; see also Jackson ex rel. K.J. v. Astrue, 734 F. Supp. 2d 1343, 1357 (N.D. Ga. 2010).   The Regulations "contain [the Listings] specifying almost every sort of [impairment] from which a person can suffer, sorted into general categories."  Shinn, 391 F.3d at 1278 (citing 20 C.F.R. § 416.925(a)).   Each listed impairment contains a discussion of the different limitations on the child's abilities that the impairment may impose.  Shinn, 391 F.3d at 1278 (citing 20 C.F.R. § 416.925(a)).   Limitations appearing in the Listings "are considered 'marked and severe.'"  Shinn, 391 F.3d at 1278 (citing 20 C.F.R. § 416.925(a)).

Limitations resulting from a child's impairment(s) meet "the Listings if the child actually suffers from the limitations specified in the Listings for that child's severe impairment." Shinn, 391 F.3d at 1278. Limitations resulting from a child's impairments medically equal "the Listings if the child's limitations 'are at least of equal medical significance to those of a listed impairment.'" Id. (quoting 20 C.F.R. § 416.926(a)(2)).

Even if the child's limitations do not medically equal the Listings, "the ALJ can still conclude that those limitations are 'functionally equivalent' to those in the Listings." Shinn, 391 F.3d at 1278. To make that determination, "the ALJ assesses the degree to which the child's limitations interfere with the child's normal life activities," using "six major domains of life[.]" Id. Those domains are:

> (i) Acquiring and using information;
>
> (ii) Attending and completing tasks;
>
> (iii) Interacting and relating with others;
>
> (iv) Moving about and manipulating objects;
>
> (v) Caring for [one]self; and,
>
> (vi) Health and physical well-being.

20 C.F.R. § 416.926a(b)(1). "A child's impairment is 'of listing-level severity,' and so 'functionally equals the listings,' if as a result of the limitations stemming from that impairment the child has 'marked limitations in two of the domains [above], or an extreme limitation in one domain.'" Shinn, 391 F.3d at 1279 (alteration in original) (quoting 20 C.F.R. § 416.926a(d) and citing 20 C.F.R. § 416.925(a)).

**B.  The ALJ's Decision**

The ALJ considered all evidence of Claimant's symptoms, including the testimony of Claimant.  Tr. at 17-28.  The ALJ followed the required three-step sequential evaluation process for children set forth in 20 C.F.R. § 416.924.  After recognizing the Claimant's adolescence, the ALJ determined at step one that Claimant had not engaged in substantial gainful activity at any time relevant to the Decision.  Tr. at 20.  Next, at step two, the ALJ found Claimant suffers from the severe impairments of borderline intellectual functioning and conduct disorder.  Tr. at 20.  Finally, at step three, the ALJ found Claimant does not have an impairment or combination of impairments that meet, medically equal, or functionally equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Tr. at 20.  Accordingly, the ALJ concluded Claimant was not disabled from October 20, 2004, the date the application was filed, through the date of the Decision.  Tr. at 28.

## IV.  Standard of Review

This Court reviews the Commissioner's final decision as to disability pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  While no deference is given to the ALJ's conclusions of law, findings of fact "are conclusive if . . . supported by 'substantial evidence' . . . ."  Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998)).  It is not for this Court to reweigh the evidence; rather, this Court reviews the entire record to determine whether "the decision reached is reasonable and supported by substantial evidence."  Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991) (quotation and citations omitted); see also McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988).  "Substantial evidence is something 'more than a mere scintilla, but less than a

preponderance.'" Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)).  The substantial evidence standard is met when there is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Falge, 150 F.3d at 1322 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  The decision reached by the Commissioner must be affirmed if it is supported by substantial evidence–even if the evidence preponderates against the Commissioner's findings.  Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158-59 (11th Cir. 2004).

## V.  Discussion

Plaintiff challenges the ALJ's Decision in three ways: First, Plaintiff asserts that the ALJ erred in finding that Claimant does not meet Listing 112.05(D), the Listing for mental retardation.  Pl.'s Mem. at 10-12.  Second, Plaintiff asserts that if the Listing is not "met," then Claimant's impairments "functionally equal" the Listings because "[a]t the very least[,] he has shown marked impairment in interacting to and relating to others which, along with the marked impairment in acquiring and using information, acknowledged by the ALJ, would warrant a favorable finding based on functional equivalence."  Id. at 12-13.  Finally, Plaintiff asserts the ALJ failed to fully and fairly develop the record as required in that the ALJ declined to order an up-to-date psychological examination and to call upon an expert to testify.  Id. at 13.  Each argument is addressed in turn.

### A.  The ALJ's Finding That Claimant Does Not Have An Impairment or Combination of Impairments that Meets Listing 112.05(D)

The ALJ found that "[C]laimant does not have an impairment or combination of impairments that meets or medically equals [the Listings]."  Tr. at 20.  In making this finding,

the ALJ specifically recognized that "[n]o treating or examining physician has mentioned findings that meet or are equivalent in severity to the criteria of any listed impairment." Tr. at 20. Plaintiff, however, argues the limitations from Claimant's impairments meet Listing 112.05(D), the Listing for mental retardation. Pl.'s Mem. at 10-12. According to Plaintiff, when Claimant's IQ scores and diagnosis of Conduct Disorder are considered together, "Plaintiff has established the criteria for disability based on listing 112.05 D." Id. at 12.

Listing 112.05 describes the condition of Mental Retardation and the requirements at issue:

> 112.05 Mental Retardation: Characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, D, E, or F are satisfied.
>
> . . .
>
> D.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function[.]

20 C.F.R. pt. 404, subpt. P, app. 1, § 112.05.

It is undisputed that Claimant meets the requirement of a valid verbal, performance, or full scale IQ of 60 through 70. Pl.'s Mem. at 11; Memorandum in Support of the Commissioner's Decision (Doc. No. 21; "Def.'s Mem.") at 9. Moreover, the Commissioner does not quarrel with Plaintiff's contention that the diagnosis of Conduct Disorder may satisfy the requirement of a mental impairment. Def.'s Mem. at 10. The Commissioner argues that Plaintiff failed to show Claimant meets the introductory language of the Listing: that which requires deficits in adaptive functioning. Id. at 9.

-24-

As the Commissioner correctly points out, Plaintiff mistakenly assumes that there are only two requirements to meet Listing 112.05: (1) the IQ score requirement; and (2) the requirement of a physical or mental impairment.  Def.'s Mem. at 8 n.3; Pl.'s Mem. at 10-12.  As the Listings and the cases interpreting them make clear, however, there is a third requirement to meet Listing 112.05 which is found in the introductory description following the title "Mental Retardation": "deficits in adaptive functioning."  20 C.F.R. pt. 404, subpt. P, app. 1, § 112.05.

The Listings for mental disorders specifically recognize that with Listing 112.05, the introductory description of the particular condition must be met, in addition to the criteria found in the body: "The structure of the [L]isting[] for mental retardation (112.05) . . . is different from that of the other mental disorders. . . . If an impairment satisfies the diagnostic description in the introductory paragraph <u>and</u> any one of the six sets of criteria, [the Commissioner] will find that the child's impairment meets the listing." 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.00(A) (emphasis added).  Thus, to meet Listing 112.05(D), the claimant must show deficiencies in adaptive functioning in addition to demonstrating the requisite IQ score and another mental or physical impairment imposing a significant limitation of function.  <u>Id.</u>; <u>see also</u> <u>Turberville</u>, 316 F. App'x at 893 n.2 (recognizing the requirement of meeting the introductory language in addition to Section D of Listing 112.05) (citing 20 C.F.R. § 416.925(c)(3)); <u>Crayton v. Callahan</u>, 120 F.3d 1217, 1219 (11th Cir. 1997) (when considering the adult version of Listing 112.05, noting "significantly subaverage general intellectual functioning" as a separate requirement from "deficits in adaptive behavior").  This requirement is consistent with accepted medical standards, which

recognize that a diagnosis of mental retardation must not only be based on IQ scores, but also on deficits in adaptive functioning.  <u>See</u> Am. Psych. Ass'n, Diagnostic and Statistical Manual of Mental Disorders (4th Ed. Rev. 2000) ("DSM IV"), p. 42 (indicating that "Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning . . . . Impairments in adaptive functioning, rather than a low IQ, are usually the presenting symptoms in individuals with Mental Retardation").  "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified mental criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990).

In analyzing whether Claimant meets or medically equals a listed impairment, the ALJ noted the complete lack of any physician opinion concluding that the Listings had been met. Tr. at 20.  Although the ALJ did not explicitly discuss why Claimant does not meet Listing 112.05(D), substantial evidence supports a conclusion that he does not.  <u>See</u> <u>Turberville</u>, 316 F. App'x at 893 (when an ALJ did not explicitly discuss why a claimant did not meet Listing 112.05, finding substantial record evidence to support the ALJ's ultimate conclusion that the claimant was not disabled and upholding ALJ's decision).  Throughout Claimant's lifetime, physicians have diagnosed him with Attention Deficit-Hyperactivity Disorder (ADHD), Adjustment Disorder, Dysthymic Disorder, Bipolar Disorder, Borderline Intellectual Functioning, Impulse Control Disorder, Depression, Insomnia, Bereavement, Anger Disorder, and Conduct Disorder, but <u>never</u> Mental Retardation.  Tr. at 196, 201, 209, 217, 211, 243, 304-05, 326, 329, 335, 379, 394, 410, 419, 448.  In fact, examining physician Dr.

Herkov specifically noted he "found no evidence of . . . retardation." Tr. at 324. Similarly, nonexamining physician Dr. Bloomfield noted Claimant "does not appear to be retarded. . . ." Tr. at 206.

The only possibility of a physician suspecting mental retardation contained in the record is Dr. Lall noting that while Claimant was residing at Hastings Youth Academy, he would "need[] academic services for probable mental retardation." Tr. at 173. This statement is far from a diagnosis; rather, it appears to be a tentative suspicion, unsupported by objective evidence, that needed to be investigated further. The record does not specifically indicate whether the issue was investigated, but less than one month later, Dr. Lall diagnosed ADHD and insomnia, with no mention of mental retardation. Tr. at 340. Without any diagnosis of mental retardation, substantial evidence supports the ALJ's conclusion that Claimant was never diagnosed with a condition that meets one of the listed impairments. See Arnold v. Heckler, 732 F.2d 881, 884 (11th Cir. 1984) (observing that no physicians opined the claimant was disabled because of pain resulting from the alleged condition).

As to the requirement of deficits in adaptive functioning, such functioning "refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." DSM IV at 42. Deficits in this area must be "significant" to meet Listing 112.05. 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.05.

The record contains evidence of Claimant's continued academic struggles, sometimes short attention span, and instances with behavioral problems that sometimes

resulted in his incarceration.   See supra Part II.   However, the record also shows that

Claimant has the ability to perform his school work, he is talented when he applies himself,

he is polite when he chooses to be, and he has no problems with caring for his own needs.

See id.   Furthermore, although not before the ALJ when the Decision was issued, the record

contains detailed summaries from Claimant's most recent facility, DeSoto Diagnosed Dual

Correctional Facility, showing Claimant's progress with both academics and behavior from

December 2008 through August 2009.[11]   Tr. at 362-437.   While Claimant's behavioral

problems did not completely subside, over time his behavior stabilized and the incidents

were less severe.   Compare Tr. at 406-407 (noting 1/30/09 incident of tying a sheet around

his own neck, 2/6/09 incident of attacking another youth from behind, 2/8/09 incident of tying

a sheet around his own neck and refusing to remove it) with Tr. at 362 (5/20/09 review

noting incidents of talking in line, not counting off properly, possession of contraband (a

magazine), cursing at staff, arguing with roommate, playing during a fire drill, and lying to

staff).   Perhaps most illustrative of Claimant's positive behavioral progression is a recent

notation, dated May 20, 2009, of the stabilization of his behavior and the progress in

effectively asserting himself.   Tr. at 362.   In addition, Claimant performed well academically

for the most part during his time at the last correctional facility.   Tr. at 348, 349.   Teachers

noted he put forth good effort and his work was improving.   Tr. at 349.   Also, supervisors

indicated Claimant was making progress in his life skills, he was often friendly, and he could

often stay focused.   Tr. at 375-76, 431.   In sum, there is insubstantial evidence to make a

---

[11]   Those records are properly before this Court because they were reviewed by the Appeals Council.  A district court may consider evidence reviewed by the Appeals Council and not by the ALJ. Ingram v. Comm'r of the Soc. Sec. Admin., 496 F.3d 1253, 1258 (11th Cir. 2007).

finding that Claimant suffered from significant deficits in adaptive functioning. <u>See</u> <u>Turberville</u>, 316 F. App'x at 893 (concluding Listing 112.05 was not met when the claimant was in two special education classes, had been held back only in Kindergarten, would be advancing to sixth grade, received an eighty-nine in his fifth grade reading course, an examining physician thought he had a learning disability rather than mental retardation, and no nonexamining physicians opined claimant met the Listing); <u>but see</u> <u>Matthews ex rel.</u> <u>Dixon v. Barnhart</u>, 339 F. Supp. 2d 1286, 1292-93 (N.D. Ala. 2004) (reversing the ALJ's decision and directing an award of benefits when the claimant had been diagnosed with ADHD and oppositional defiant disorder, had low IQ results equating to mental retardation, was placed in special education classes, repeated grades, was in danger of failing another grade at the time of his hearing, and his cognitive and communicative functioning were below normal).

In light of the foregoing, substantial evidence supports the ALJ's finding that Claimant does not meet Listing 112.05(D).

### B. The ALJ's Finding that Claimant Does Not Functionally Equal the Listings

Having found that Claimant does not meet or medically equal any Listings,[12] the ALJ next evaluated whether Claimant's impairments functionally equal the Listings. Tr. at 20, 23-28. In doing so, the ALJ specifically considered the six domains which are broad areas of functioning. Tr. at 23-28. As indicated <u>supra</u> Part III, to functionally equal a Listing, a claimant must show he has a "marked" limitation in two domains, or an "extreme" limitation in one domain. A marked limitation is one that "interferes seriously with [the] ability to

---

[12]    Plaintiff does not argue the ALJ erred in finding Claimant's impairments do not medically equal the Listings, so that finding need not be addressed.

independently initiate, sustain, or complete activities," and is more than moderate. 20 C.F.R. § 416.926a(e)(2)(i).

The ALJ found Claimant to have a "marked" limitation in only one domain: Acquiring and Using Information. Tr. at 23-24. The ALJ found less than marked limitations in the domains of Attending and Completing Tasks, and Interacting and Relating with Others, Tr. at 24-25, and the ALJ found no limitations in the domains of Moving and Manipulating Objects; Caring for Oneself; and Health and Physical Well Being. Tr. at 25-27. Accordingly, the ALJ found Claimant does not functionally equal the Listings because he does not have a marked limitation in two domains or an extreme limitation in one domain. Tr. at 27.

Plaintiff asserts that if the Listing is not "met," then Claimant's impairments functionally equal the Listings because "[a]t the very least[,] he has shown marked impairment in interacting to and relating to others which, along with the marked impairment in acquiring and using information, acknowledged by the ALJ, would warrant a favorable finding based on functional equivalence." Pl.'s Mem. at 12-13. Plaintiff does not provide any facts to support the argument that Plaintiff has a marked impairment in interacting and relating to others. See id.[13]

A marked limitation in the domain of Interacting and Relating with Others is demonstrated by a serious limitation in one's ability to initiate and sustain emotional connections with others, develop and use the language of the community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others. 20 C.F.R. § 416.926a(i). Examples of difficulties in this domain include problems

---

[13]     Plaintiff does not take issue with the findings in any of the five other domains, so they are not addressed herein.

keeping friends, difficulty communicating with others, and issues speaking intelligently or with adequate fluency.  20 C.F.R. § 416.926a(i)(3).  The ALJ specifically recognized that Claimant "has demonstrated difficulty with authority and following rules" as evidenced by Claimant's burglary charge and conviction and his violation of probation.  Tr. at 25. However, the ALJ found that Claimant "has been described as cooperative during the psychological and psychiatric evaluations in 2004, 2005, and 2006."  Tr. at 25 (citation omitted).  Substantial evidence supports the ALJ's observation regarding Claimant's cooperation.  See Tr. at 25, 304, 316, 324.

Further support is found in the record for the conclusion that Claimant has a less than marked limitation in this domain. In 2002, Claimant's third-grade teacher indicated he had slight problems in many areas related to interacting and relating with others. Tr. at 267. While at Greenville Hills Academy in 2006, Claimant had issues with disrespect, but evaluators recognized Claimant's ability to be polite when he chose to be.  Tr. at 244. Claimant's intake evaluation for his 2008 incarceration indicated he "can communicate with others and enjoys working in groups."  Tr. at 472. Other evaluations demonstrate improvement with peer relations and attitude. Tr. at 362, 377. Also, as noted by the ALJ, Tr. at 26, the only physicians who opined on the domains of functioning–nonexamining physicians Dr. Bloomfield and Dr. Boger–assigned less than marked limitations in the domain of interacting and relating with others.  Tr. at 204-05, 215, 221.

In sum, substantial evidence supports the ALJ's finding that Claimant has less than a marked limitation in the domain of interacting and relating with others, and by extension the finding that Claimant does not functionally equal the Listings.

### C.    The ALJ's Duty to Develop the Record

Plaintiff argues the ALJ failed to adequately develop the record in that she did not refer Claimant for another psychological evaluation, and she did not call upon an expert to testify.[14]  Pl.'s Mem. at 13.  "It is well-established that the ALJ has a basic duty to develop a full and fair record."  Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003) (citing 20 C.F.R. § 416.912(d)).  "Nevertheless, the claimant bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim."  Ellison, 355 F.3d at 1276 (citing 20 C.F.R. § 416.912(a); 20 C.F.R. § 416.912(c)).  The Regulations do not require the ALJ to "update objective medical evidence to the time of the hearing as [Plaintiff] suggests."  Luna v. Shalala, 22 F.3d 687, 693 (7th Cir. 1994).  Furthermore, to remand a case for the ALJ's failure to fully develop the record, there must be a showing that the claimant's right to due process has been violated because of such failure.  Brown v. Shalala, 44 F.3d 931, 934-35 (11th Cir. 1995).  Prejudice exists when the record contains evidentiary gaps which may cause the ALJ to reach an unfair determination due to the lack of evidence.  Id. at 935.

The record contains no such gap; indeed, Plaintiff does not even argue the ALJ's decision not to order an additional psychological evaluation violated Claimant's due process rights.  See Pl.'s Mem. at 13.  Instead, Plaintiff seems to be focused on limitations resulting from Claimant's alleged ADHD.  Id.  The ALJ specifically recognized Plaintiff's request, and wrote that she was "not convinced such is necessary."  Tr. at 23.  The record contains evaluations or treatment notes from eight different doctors, none of whom had consistent

---

[14]    Plaintiff does not suggest a subject about which an expert should have been called to testify.  She merely indicates "[t]he ALJ also had the option to call an expert to testify."  Pl.'s Mem. at 13.

diagnoses or recommended similar treatment other than to place Claimant on some type of medication. See supra Part II.B. The ALJ found that medication effectively controls Claimant's ADHD, Tr. at 23, and Plaintiff does not challenge this finding. The ALJ had no reason to conclude that a further psychological evaluation would yield a diagnosis contrary to the medical evidence contained in the record. See Brown, 44 F.3d at 935 (holding that the ALJ did not fully and fairly develop the record when he knew of other medical evaluations which could have helped the Claimant's case). Further, there is no requirement that the ALJ hear from an expert. Because the ALJ carefully considered the medical evidence contained in the record, and the record was adequately developed, she was justified in concluding that no further psychological evaluation was necessary and no expert testimony was necessary. Accordingly, the ALJ fully and fairly developed the record.

## VI. Conclusion

After a thorough review of the record, the undersigned is convinced the ALJ properly found that Claimant does not meet the Listings or functionally equal the Listings. Additionally, the ALJ fully and fairly developed the record. Finally, a review of the entire record indicates the ALJ's Decision is supported by substantial evidence. Accordingly, it is

**ORDERED:**

1. The Clerk of Court is directed to enter judgment pursuant to sentence four of 42 U.S.C. § 405(g) as incorporated by § 1383(c)(3) **AFFIRMING** the Commissioner's final decision.

2.    The Clerk of Court is directed to close this case.

**DONE AND ORDERED** at Jacksonville, Florida on March 30, 2011.

_James R. Klindt_
**JAMES R. KLINDT**
United States Magistrate Judge

kaw
Copies to:
Counsel of Record